FOSHEE & TURNER COURT REPORTERS

Page 138

1    improvement in that category?

2        A      He stated if the store -- we

3    work as a team.  If the store numbers are

4    down it applies to everyone.

5        Q      Okay.  And he says on

6    supervisor's summary, is that

7    Mr. Finnegan's handwriting?

8        A      To my understanding it is.

9        Q      It says, "Diane needs to show

10   more initiative in goal setting on a

11   daily and monthly basis.  Also needs to

12   work on planning in collections and

13   marketing."  What did that mean planning

14   in collections and marketing?

15       A      That means to do his job.  It

16   was not my job to plan.  It was not my

17   job to set up a marketing plan.  When I

18   became the manager that was my job.

19       Q      Did you tell him that's not my

20   job?

21       A      No, I didn't tell him.  I

22   always tried -- I always take the

23   initiative to my understanding to

**EXHIBIT**

**I**

(PART 2 OF 3)

1    do -- play as a team and do whatever I

2    need to do.

3        Q    It says be more proactive

4    towards those areas.  Finally needs to

5    work on delegation and supervisor of

6    others when given the opportunity.  Do

7    you know what he's referring to there?

8        A    The only thing I could think

9    of is that, like I say, he was the

10   training manager at the time.  He had

11   different people coming in, manager

12   candidates coming in and going through

13   the two-week manager training.  That's

14   the only person that I would have had

15   supervised at that point.

16       Q    What about the CSR?

17       A    No.  It was just myself and

18   Edward Finnegan.

19       Q    He says in closing, "Diane

20   needs to fine tune this area of

21   delegation planning organization."  Did

22   he discuss that with you?

23       A    Bottom line, like I said,

Page 140

1    what he was pretty much discussing was

2    that the manager trainees coming through

3    the two-week program, training program,

4    he stated to me if I see where they need

5    to be trained in a certain area, if I see

6    where -- let me see.  That's the only

7    thing I can think of is that I needed to

8    assert myself with the trainees that's

9    coming through.

10        Q     This discussion was with

11   Mr. Finnegan, not Mr. Knowles, correct?

12        A     Correct.

13        Q     And then it says, B, "Explain

14   what steps you plan to take toward

15   improving employee's performance."  He

16   says,"I plan to show Diane how to be more

17   proactive and set goals on a daily basis

18   and monthly evaluate the present

19   situation and make decisions from that

20   evaluation."  Did you have such meetings

21   with Finnegan later?

22        A     We would have meetings.

23        Q     Where that would be discussed?

FOSHEE & TURNER COURT REPORTERS

Page 141

```
 1      A      Within the branch, yes.

 2      Q      And then he indicates

 3  promotable with additional training and

 4  experience.  Now, this was signed on

 5  August the 12, 2002.  That was before you

 6  went up for manager?

 7      A      Right.

 8      Q      It was before the time Mercer

 9  was promoted to management?

10      A      She was manager at this time.

11      Q      At this time?  Okay.

12      A      Right.

13      Q      Could you read your comments

14  on this?

15      A      "My concerns are with the

16  initiative and delegation issues.  Every

17  day that I am here I take the initiative

18  to make decisions on running the branch

19  while the manager, now divisional

20  training manager, is not in.  For

21  example, customer appreciation day.  I

22  worked really hard and have trained

23  several people, people working in the
```

Page 146

1    made reference to the one incident being

2    the overall evaluation of my full

3    performance.  I did not make reference as

4    you can read to what I plan on doing but

5    I did -- but I did make reference to I am

6    a team player and I do give a hundred

7    percent so nothing would have changed.

8        Q      Right.  You did not --

9        A      Not here in writing I didn't

10   but I mean whatever it took I was willing

11   to -- which I've told Edward Finnegan on

12   several different occasions willing to

13   learn.

14                  (Defendant's Exhibit

15                  No. 6 was marked

16                  for identification.)

17       Q      Okay.  I'm going to hand you

18   what I'm going to mark as the next

19   exhibit.  This is really hard to read.  I

20   understand.  I was trying to get some

21   dates down here.  If you look real hard

22   at the top it says status change.  It's

23   got an X marked by it and it appears that

FOSHEE & TURNER COURT REPORTERS

Page 147

1    the effective date of this status is

2    going to be November 25, 2002.  And I'm

3    assuming that is the time that you were

4    promoted from -- I'm sorry.  It says

5    transfer in here from location 1624 to

6    1653.  Do you see that?  Current location

7    and new location right in here?

8        A    No, I don't.

9        Q    You've got to look really

10   hard.

11       A    Okay.

12       Q    What was the current location?

13   What was 1624?

14       A    I don't know what -- 1622 is

15   the store where I was.

16       Q    Which was?

17       A    Enterprise.

18       Q    Okay.  You think they made a

19   mistake there?

20       A    Probably.

21       Q    And 1653, what was that?

22       A    That was the Ozark branch.

23       Q    Okay.  And you got a big raise

Page 148

1    here between 8.63 and 11.06.  Do you see

2    that?

3         A      Show me where you're reading

4    from.

5         Q      Where it says salary change?

6         A      Right.  Okay.

7         Q      Okay.  But it says that it's a

8    transfer adjustment.  Do you know what

9    that was?

10        A      That when I got promoted to

11   manager.

12        Q      That's what I assume.  I

13   couldn't tell because everything is

14   blocked out.  So your promotion would

15   have been effective on November the 25th,

16   2002?

17        A      Correct.

18        Q      When you got to be a manager

19   did you receive any training?

20        A      No.

21        Q      Okay.  Did you have access to

22   manuals?

23        A      Yes.

Page 149

```
 1        Q      What kind of manuals did you

 2   have access to?

 3        A      Operations manual.

 4        Q      All right.  Did you have

 5   access to the first guide?

 6        A      Yes.

 7        Q      And did you have access to the

 8   employee handbook?

 9        A      Yes.

10        Q      Did you refer to all four of

11   those documents, go through those

12   documents?

13        A      As best as I could, yes.

14        Q      They were there for you to

15   look at at any time?

16        A      Right.

17                    (Defendant's Exhibit

18                     No. 7 was marked

19                     for identification.)

20        Q      Okay.  I'm handing you

21   Exhibit No. 7 and ask you if you

22   recognize that to be your

23   performance review that was done on or on
```

FOSHEE & TURNER COURT REPORTERS

Page 150

1    or about -- it looks like June 1, 2003?

2         A     It appears to be, yes.

3         Q     Okay.  And this is the first

4    performance review that you would have

5    gotten from Mr. Knowles, is that correct?

6         A     Right.

7         Q     And Mr. Knowles had approved

8    the other performance reviews you had

9    gotten but he did not do them directly?

10   He was the next level, correct?

11        A     Correct.

12        Q     Who would have been your next

13   level on this, do you know?

14        A     At this time?

15        Q     It looks like it was Jennifer

16   Rodriguez?

17        A     Yes.

18        Q     Did you actually have a

19   discussion with Mr. Knowles about this

20   particular performance review?

21        A     Yes.  He came in.  He come to

22   my branch in Ozark and went over it.

23        Q     Do you recall what your

FOSHEE & TURNER COURT REPORTERS

Page 151

1    discussions were with him about this

2    particular review?

3        A      He just pretty much went over

4    everything, explained what I got and why

5    I got it and that was it.

6        Q      Did you tell him that you

7    disagreed with anything?

8        A      I don't recall at this point.

9        Q      Looking at INT 26 it appears

10   that he had rated you two for initiative,

11   the same as Mr. Finnegan had; is that

12   correct?

13       A      Yes, I see that.

14       Q      Was there any discussion about

15   that?

16       A      He pretty much told me what

17   he felt about it, why he gave me the two

18   for my initiative.

19       Q      What did he say?

20       A      I don't particularly recall

21   the conversation.  I know that he went

22   through every category.  He explained why

23   I received what I received.

Page 152

1      Q      Was it done in a calm,

2    professional manner?

3      A      Yes.

4      Q      You're a professional?  He was

5    a professional?

6      A      It was done in a calm manner,

7    yes.

8      Q      And under communication skills

9    he rated you as a two and needs

10    improvement, correct?

11      A      What page is that?

12      Q      I'm sorry, that's INT 27.

13      A      Yes.

14      Q      Okay.  Did he talk to you

15    about that, why you needed improvement in

16    that?

17      A      He never -- nothing that

18    stands out of my head.  He never went

19    into details.  Just, that, you know, you

20    got a three here, you got a two there,

21    three here, any questions and sign it and

22    pretty much we didn't really sit down for

23    long and talk about the evaluation.

Page 153

1    Q    And you did not make any

2    employee comments in this particular

3    evaluation you did?

4    A    No.

5    Q    And it says do you concur with

6    the evaluation.  Check one.  And you

7    marked yes, correct?

8    A    From what he said it really

9    didn't matter whether you marked it yes

10   or no.

11   Q    Well, I mean it is true that

12   the last time you did put in comments,

13   correct?

14   A    Correct.

15   Q    You did disagree with it in

16   the previous evaluation?

17   A    That's correct.

18   Q    Okay.  And it says employee's

19   potential for advancement.  It says, "Do

20   not recommend advancement at this time."

21   That would have been the lowest rating

22   you could have gotten in that particular

23   box, correct?

FOSHEE & TURNER COURT REPORTERS

Page 154

1       A       Correct.

2       Q       But you didn't make any

3   comments to Mr. Knowles about that?

4       A       Not written comments.  I

5   questioned him about that.  He said no

6   one is getting promoted.  He said he's

7   not even getting marked for promotion.

8   He told me besides there's nowhere else

9   to go unless I want DDO and then he said

10  he don't plan on leaving any time soon.

11  If I want to throw my hat in the ring and

12  try somewhere else and move then I can

13  try for it.

14      Q       Okay.

15                  (Defendant's Exhibit

16                  No. 8 was marked

17                  for identification.)

18      Q       Now, I'm just trying to get

19  some dates tacked down here.  This

20  transfer form or status change form

21  indicates you went from the old location

22  1653, which was Ozark, am I right on

23  that?

Page 156

1    A    I don't know this is.

2    Q    Do you know what the

3 June 14, 2004 date is?  Does that

4 coincide with when you moved to

5 Enterprise?

6    A    To my understanding I moved to

7 Enterprise In October.

8    Q    October of '04?

9    A    Yes.

10    Q    Got you.  All right.  Well, I

11 will clear that up with somebody else

12 then.

13              (Defendant's Exhibit

14              No. 9 was marked

15              for identification.)

16    Q    Okay.  You recall Exhibit

17 No. 9?  Do you remember receiving an

18 employee counseling report which is dated

19 August 3, 2004 and is now

20 Exhibit 9?

21    A    Okay.

22    Q    Do you recall getting this

23 counseling?

FOSHEE & TURNER COURT REPORTERS

Page 157

1        A        Yes.

2        Q        Tell me what the circumstances

3    were that caused this counseling to come

4    about.

5        A        Just what it stated, that my

6    CSR was violating the Federal Law and the

7    Federal Fair Debt Collection Practices.

8        Q        Okay.  What happened?

9        A        According to what he wrote

10    down she was giving third party contacts

11    and leaving them also in violation in

12    saying threatening remarks to a third

13    party.

14        Q        Now, did you participate in

15    doing these things?

16        A        Not to my knowledge.  There

17    were several conversations going on at

18    one time.  She would be on the phone and

19    I would be on the phone collecting at the

20    same time so --

21        Q        And you're responsible for her

22    collection practices?

23        A        I am as a manager.

FOSHEE & TURNER COURT REPORTERS

Page 158

1      Q      How big was the store that
2   you were working in size wise?
3      A      I believe at that time I guess
4   bigger than this room.
5      Q      This room is about maybe
6   thirteen feet square, fifteen, maybe
7   fifteen feet square?
8      A      I guess.
9      Q      And how many phones were in
10  there?
11     A      Three phones.  Three lines.
12     Q      And you were in a position to
13  hear what Shmeka was saying over the
14  telephone when she talked?
15     A      I guess as a manager.
16     Q      I mean it's a fact you did
17  know what she was doing, didn't you?
18     A      I don't recall at this time
19  so I would rather not answer that.
20     Q      Where did this counseling take
21  place?
22     A      In the Ozark branch.
23     Q      And who was present?

FOSHEE & TURNER COURT REPORTERS

Page 159

1      A      I don't think anyone was

2    present.

3      Q      Okay.  And at the time you

4    told your boss that you didn't have any

5    recollection of events, correct?

6      A      I guess in my statement I

7    wrote that down, yes.

8      Q      And this statement is under

9    the employee comments, right?

10     A      Yes, it is.

11     Q      And you're telling him that

12   you want to see evidence that it

13   happened, correct?

14     A      He stated that he had evidence

15   of whatever, something had occurred and

16   he said that he cannot produce evidence

17   or if I don't admit to wrongdoing or

18   something and I said I don't recall.  I

19   said in some instances where, you know,

20   we talk on the phone at the same time.  I

21   don't listen to every phone conversation

22   that she has and he refused to comment on

23   it.  He just stated that he had evidence

Page 160

1    of wrongdoing and that was it.

2        Q    Was Shmeka given any kind of

3    discipline because of this?

4        A    I was told by John Knowles

5    that he would handle it.  We both were

6    written up.

7        Q    Now, look at INT 22.  Okay.

8    It says Customer Service Inquiry, which

9    was attached to the counseling, and let

10   me ask you the counseling -- the

11   handwriting on INT 20 and 21 that's your

12   handwriting, correct, at the bottom,

13   except for Mr. Knowles' signature?

14       A    Employee comments?

15       Q    Yes.

16       A    Yes.

17       Q    And on 21 that's your

18   handwriting, correct?

19       A    Yes.

20       Q    Okay.  Now, on 22, have you

21   seen 22 before?

22       A    No, I have

23   not.

FOSHEE & TURNER COURT REPORTERS

Page 161

1      Q      Do you know who Angela Craig

2   is?

3      A      She was a customer in Ozark.

4      Q      Okay.  And what is CSS?

5   It says, "The customer listed below

6   contacted CSS for assistance."

7      A      Where are you reading from?

8      Q      Look on 22 right there, the

9   first paragraph.

10     A      Okay.  That would be

11  corporate.

12     Q      Okay.  Is there a hot line

13  number that people can call, customers

14  can call to complain about the way

15  they're being treated by local

16  management?

17     A      Yes.

18     Q      And the CSS, would that be

19  that group?

20     A      I believe so.

21     Q      Okay.  And written down is a

22  description of the inquiry.  "Requesting

23  payment arrangements.  Very rude

FOSHEE & TURNER COURT REPORTERS

1    employees."

2                   Now, who were the

3    employees at your division at that time

4    or at your store center?  I'm sorry.

5         A     Myself and Shmeka.

6         Q     There would not have been more

7    than just the two of you, correct?

8         A     Correct.  Not at that time.

9              MR. GRAY:  Let's take a break.

10             (A break was taken.)

11             MR. GRAY: Let's go back on the

12    record.

13        Q     Earlier you testified that

14    you had not had any contact -- my

15    understanding of your testimony is that

16    you did not have any contact with

17    Ms. Stewart before she became RDO; is

18    that correct?

19        A     I didn't talk to her.  I never

20    have spoken to her, only during business

21    meetings.  The branch manager meetings,

22    she would be there.  Her and John would

23    conduct meetings together.

Page 168

1    would be a problem.

2        Q      You had problems with Shmeka,

3    too, didn't you?

4        A      I had incidents with Shmeka

5    where I discussed with her --

6        Q      You were constantly having to

7    call the DDO about your problems with the

8    subordinates, correct?

9        A      Before I made a

10   decision -- no, I wouldn't even say that.

11   To cover myself I would discuss

12   situations with my DDO if that's what I

13   felt like he was there for.

14       Q      Okay.

15                      (Defendant's Exhibit

16                      No. 10 was marked

17                      for identification.)

18       Q      I'm going to show you Exhibit

19   No. 10 and ask if you recognize it?

20       A      Yes.

21       Q      Okay.  And what is Exhibit

22   No. 10?

23       A      This appears to be an audit.

Page 169

1       Q       Okay.  Do you recall when this

2    audit was done?

3       A       I believe it was not in the

4    location at the time this audit was done

5    but --

6       Q       Go ahead.

7       A       I'm sorry.

8       Q       Wherever you are.

9       A       I believe is this the -- I'm

10   not sure as far as the date.  I could

11   tell you my first audit that I received

12   in the Enterprise location return as to

13   manager I was out on that day.  I was not

14   in and he come to the store,

15   Mr. Knowles, and Deborah Mercer being the

16   area manager.  They conducted this audit

17   and I was later given this to sign.

18      Q       Okay.  And did you read the

19   audit at the time?

20      A       I didn't really read over in

21   detail.  I remember asking him

22   he's -- what does some of the things

23   mean, you know, as far as does this mean

FOSHEE & TURNER COURT REPORTERS

Page 170

1    that I'm doing my job.  What does it mean

2    to me.  He stated that this is just to

3    get a basic evaluation of things.  He

4    know that -- let me see the date of this.

5    Okay.  This would be my second audit.

6    I'm not sure.

7        Q      I believe this is the second

8    audit.

9        A      Okay.  At the time I was

10   present during the second audit then.

11       Q      Okay.  And tell me about the

12   second audit, how was it conducted?

13       A      It was pretty much as normal.

14   He come in and did the audit and sat down

15   with me afterwards.  I asked him -- I

16   said this audit doesn't look too well.

17   What does this mean.  I asked Mr. Knowles

18   several times if he can get me some help

19   with the collections because at that

20   point in time they stated that they had a

21   floater going around helping the

22   different branches with collections and I

23   asked him did -- I told him that I needed

FOSHEE & TURNER COURT REPORTERS

Page 171

1    help with the collections and he stated

2    that, you know, eventually he will work

3    on that and get the collections done so I

4    asked him what does this mean.  He stated

5    I don't have to worry about anything.  I

6    said does it mean I don't have a job

7    because the audit is not looking

8    too -- it's not looking good and he

9    stated to me that no I don't have

10   anything to worry about.

11        Q      Who said that?

12        A      John Knowles.

13        Q      Okay.  And at that point you

14   didn't have anything to worry about but

15   this is a bad audit, correct?

16        A      I assume it's not

17   where -- in the area of marketing, yes,

18   he did give me a low score.

19        Q      And basically the overall

20   score is not that good, correct?

21        A      It's not that bad overall but

22   in that one area.

23        Q      Let's look at Page INT25.  It

Page 172

1    says in the comments section,

2    "Daily/weekly tracking sheets in

3    complete.  Two, team members marketing

4    program sheets not available.  Three, no

5    evidence of street marketing.  Tear sheet

6    route, flyer routes exist.  Cannot find

7    proof of any marketing activity.  When

8    asked Manager Diane Murphy produced a one

9    page sheet of paper with one set of

10   apartments where door hangers were placed

11   with a date of 12-13-04 as the date of

12   the marketing activity.  No other proof

13   was presented.  She said she had other

14   sheets with information on them but did

15   not know what happened to them.  And the

16   conclusion.  The required marketing

17   program activity is not being worked

18   therefore it is infective.  This is a

19   repeat finding from the previous DDO

20   audit."

21              You had been counseled

22   before on your failure to do marketing

23   activity, correct?

FOSHEE & TURNER COURT REPORTERS

Page 173

1    A    The first counseling where I

2  actually was audited like this was stated

3  that there was no sign of a marketing

4  plan.  And he stated to me and I stated

5  to him there's no way that I could have

6  come in and gotten up a marketing plan at

7  that point in time.

8            He stated that he

9  realized there were certain things

10  Ed Finnegan did not do because there was

11  no marketing plan within the store at

12  all.  It would be the first audit.

13    Q    The first audit, if you look

14  at the first page of this document, would

15  have been the audit on September the

16  21st, 2004?

17    A    I guess so.

18    Q    Okay.  And you had not fixed

19  it by December the 16th, 2004, correct?

20    A    In his opinion.

21    Q    Okay.  And there was an

22  intermediate audit, correct, on

23  November the 2nd 2004?

FOSHEE & TURNER COURT REPORTERS

Page 174

1    A    Where do you see that at?

2    Q    Where it says previous two DDO

3    audits?

4    A    I'm not seeing it.

5    Q    Right here, the first page

6    about three quarters of the way down.

7    Previous two DDO audits.  Actually there

8    were three audits, correct?

9    A    I assume.  I don't recall.

10    Q    You had three months to get a

11    marketing plan in effect and you hadn't

12    done it?

13    A    That's what he said.  I had a

14    marketing plan.  I asked John Knowles

15    several times to send me some help

16    because I could not do everything that

17    was called to do during the course of the

18    day with one less person.  I didn't have

19    half the help that Edward Finnegan had

20    and I told him I needed help.  He stated

21    to me don't worry about it.  We will

22    eventually get you somebody in because

23    we've got this one, his name was Todd.

FOSHEE & TURNER COURT REPORTERS

1    He was a floater and he was going around

2    helping out in the branches because there

3    was a high rate of bad debt at that time.

4        Q     It appears from this that your

5    boss couldn't find any evidence of

6    marketing, if you will look at INT125,

7    and you only produced a small amount of

8    documents relating to a

9    December 13, 2004 attempted marketing,

10    correct?

11        A     That's what he is stating.

12        Q     Did you give him any other

13    documents?

14        A     I gave him an additional page

15    to what I had in the marketing book.

16        Q     And when did you do that?

17        A     That day when he

18    requested -- he asked for my marketing.

19    I said well I don't have anything

20    organized.  This is what I have.  I said

21    there's an additional page.  That's when

22    I gave him that page.

23        Q     Right.  Now, he found that

FOSHEE & TURNER COURT REPORTERS

Page 176

1    unacceptable that you had not done your

2    marketing plan, correct, in his mind?

3        A      Right.  He had something That

4    I did not do my marketing plan.

5        Q      Had you done a marketing plan?

6        A      Yes, I had to the best of my

7    knowledge and my ability with the help

8    that I had.

9        Q      There was a problem with a

10   toilet in the Enterprise location when

11   you came, right?

12       A      Correct.

13       Q      What was the problem there?

14       A      The water was running.

15       Q      It was broken?

16       A      It was broken.

17       Q      And on one of the performance

18   evaluations that was pointed out to you,

19   correct, that you needed to get it fixed?

20       A      Yes.

21       Q      Did you get it fixed?

22       A      I did.

23       Q      Tell me how did you get it

FOSHEE & TURNER COURT REPORTERS

1    fixed.

2        A    I called a plumber and he came

3    to fix it.

4        Q    And why hadn't you done it

5    before your manager told you to do it?

6        A    John Knowles come in.  I had

7    just got assigned to that store.  Certain

8    things like cleaning the microwave, doing

9    this little petty stuff which I did get

10   done in a timely manner.

11       Q    Okay.  But he came in and he

12   found the store to be dirty?

13       A    That's what he stated.

14       Q    And whose responsibility was

15   it to keep the store clean?

16       A    Everyone.

17       Q    And as the manager you were to

18   lead the effort to keep it clean?

19       A    Correct.

20       Q    I mean you were the one,

21   right?

22       A    Correct.

23       Q    And who else would have been

1    responsible under you?

2        A      Everybody that's responsible

3    to pitch in and help as a team.

4        Q      Let me ask you who at that

5    time under you would have been

6    responsible for --

7        A      Lisa was there with me at the

8    time.

9        Q      And tell me about how long had

10   the commode had been broken before

11   Mr. Knowles came in and saw that it was

12   leaking on the floor?

13       A      It was not leaking on the

14   floor.  It was a constant running noise.

15   It was not leaking on the floor.  To my

16   knowledge I got it taken care of in a

17   timely manner.  I don't quite remember

18   the dates.

19       Q      Okay.  Did you have a cleaning

20   service that came in and cleaned the

21   place?

22       A      No.

23       Q      Was that standard with all the

FOSHEE & TURNER COURT REPORTERS

Page 179

1    stores that you didn't have cleaning

2    services?

3        A     Right.

4        Q     It was always the

5    responsibilities of the employees to

6    clean the unit?

7        A     Right.

8        Q     Okay.  Who used the toilet

9    facility in that store?

10       A     Employees.

11       Q     And how many toilet facilities

12   were there?

13       A     There was one.

14       Q     And it was then the employees

15   that used it and the employees that

16   cleaned it, correct?

17       A     Correct.

18       Q     And that was true of all of

19   the stores, correct?

20       A     Correct.

21       Q     Was there ever a discussion

22   that you had with anybody about cleaning

23   the toilets?

Page 180

1        A        Not to my recollection.  We

2    discussed with John Knowles who brought

3    that to my attention.  He stated to me I

4    know this is Ed's mess because he didn't

5    clean it.  It should have been done

6    before you got here but I want you to do

7    it.  He referred to the stuff in the

8    microwave or whatever but I don't quite

9    remember a reference to the toilet.

10       Q        There's no reference to the

11   toilet made by Knowles?

12       A        Well, yeah, of course, to get

13   it fixed.

14       Q        That was all just to get it

15   fixed?

16       A        And for somebody to clean it.

17   He said come up with a schedule, cleaning

18   schedule or whatever but it needed to be

19   taken care of.  He said he realized it

20   should have been taken care of when

21   Edward Finnegan or whoever else was there

22   but it needed to be taken care of at that

23   point.

Page 181

1       Q       Okay.

2       A       Now that I'm there he told me

3   to take care of it.

4       Q       You guys came up with a

5   cleaning schedule?

6       A       Yeah.  It was -- like I said,

7   it wasn't like a straight schedule.  If

8   the bathrooms needed to be cleaned we

9   were -- to my understanding we were going

10  to do it once a week or as needed.

11      Q       By "we" who are you talking

12  about?

13      A       Myself and Lisa.  Whoever the

14  CSR was at the time.

15      Q       Did Lisa ever do any of the

16  cleaning?

17      A       She did.

18      Q       Did you ever do any of the

19  cleaning?

20      A       I did.

21      Q       Was it pretty much split

22  evenly who did the cleaning or did she do

23  more or you do less of it?

FOSHEE & TURNER COURT REPORTERS

Page 182

1    A    It was pretty much split

2    evenly.  It was a lot of stuff.  There

3    was a mess back there that I walked in

4    and it took a lot of time.  I came in on

5    my time off and cleaned.

6    Q    Lisa was a white female?

7    A    Yes, she was.

8    Q    But that's all you remember

9    about Knowles telling you about cleaning

10   the place up?

11   A    At this time that's all I

12   recall.

13   Q    You might remember something

14   later?

15   A    No.

16   Q    What would refresh your memory

17   on something like that?

18   A    I'm not sure.

19   Q    When Knowles told you this it

20   was done in a calm, professional manner?

21   A    Yeah, I would say.  More like

22   a casual manner just in conversation.

23   Q    And you didn't take exception

FOSHEE & TURNER COURT REPORTERS

Page 183

1    to it because you knew that, in fact,

2    that was the responsibility of the people

3    at the store to clean that?

4          A       Restate that again.

5          Q       You didn't find anything wrong

6    with that or unusual about it because you

7    knew that it was the manager and the

8    assistant managers and the CSR's

9    responsibility to maintain the store?

10         A       Right.  I felt like it should

11   have been maintained or cleaned before I

12   got there.

13         Q       I have some real quick

14   documents to run through.

15   Is this your signature on the

16   acknowledgement and proof of acceptance

17   of the employee handbook?

18         A       Yes, this is my signature.

19                 (Defendant's Exhibit

20                 No. 11 was marked

21                 for identification.)

22         Q       And, in fact, you had access

23   to the employee handbook both as an

FOSHEE & TURNER COURT REPORTERS

```
 1    assistant manager and a manager, is that

 2    correct?

 3         A     Yes.

 4                    (Defendant's Exhibit

 5                     No. 12 was marked

 6                     for identification.)

 7         Q     And can we agree that

 8    Exhibit No. 12 is the policy on denial of

 9    loans that was in effect at the time that

10    you worked for Advance America?

11         A     Yes.

12         Q     And you had access and

13    training on that policy?

14         A     Yes.

15                    (Defendant's Exhibit

16                     No. 13 was marked

17                     for identification.)

18         Q     And Exhibit No. 13 is the

19    policy on prohibited collection

20    practices, correct?

21         A     Correct.

22         Q     And you had training and

23    access on those practices prior to the
```

FOSHEE & TURNER COURT REPORTERS

Page 185

```
1    time or while you were at Advance

2    America?

3         A    Yes.

4         Q    How early did you get training

5    on these policies?

6         A    I'm not sure.

7         Q    Right after you were employed?

8         A    I assume.

9                    (Defendant's Exhibit

10                   No. 14 is marked

11                   for identification.)

12        Q    And Exhibit No. 14 is your

13   Acknowledgement and Proof of Acceptance

14   of the Anti-harassment Policy, correct?

15        A    Yes.

16        Q    That's your signature there,

17   correct?

18        A    Yes, sir.

19        Q    You always had access to the

20   anti-harassment policy and reporting

21   procedures that accompanied the policy,

22   correct?

23        A    Correct.
```

Page 186

1    Q    And you understood at the time

2    that you had a direct opportunity to

3    report any harassment or discrimination

4    directly to the corporate office?

5    A    Okay.

6    Q    Is that correct?

7    A    Correct.

8    Q    And you never personally ever

9    contacted anybody at the corporate office

10   about any of your complaints of

11   discrimination?

12   A    Not before it -- the person,

13   HR in Human Resources called me

14   concerning that complaint.

15   Q    That was back right before you

16   got promoted?

17   A    Right.

18   Q    What was your title when you

19   left the company?

20   A    Branch manager.

21                (Defendant's Exhibit

22                No. 15 was marked

23                for identification.)

Page 190

1    Fifie since then?

2        A      Only in passing.

3        Q      Have you talked about the case

4    again?

5        A      No, no.  I mean she said all

6    she needed to say.

7        Q      Did you know Fifie before she

8    was a customer at Advance America?

9        A      No.

10       Q      Do you have any social

11   relationships with her now?

12       A      No.

13       Q      Not belong to the same club or

14   anything like that?

15       A      No.

16       Q      All right.  Have you talked to

17   anybody else about this case?  First,

18   anybody that works or has worked at

19   Advance America and, of course, not your

20   attorney?

21       A      No.

22       Q      Then if you will look you've

23   attached some documents.  The first

FOSHEE & TURNER COURT REPORTERS

Page 191

1    document is the termination report.  Can

2    you tell me when you got this termination

3    report or the first time you saw it?

4         A    Well, it's dated December

5    29th.  That would be the day.

6         Q    Okay.  And you recall how you

7    received it?

8         A    Yes.  John Knowles came to the

9    branch, the Enterprise branch, and he

10   waited there for awhile in the parking

11   lot until Brenda Stewart pulled up and

12   they both came in and waited for awhile

13   and then I guess they waited till my

14   CSR returned back to the location and

15   they called me to the back of the branch

16   and he gave me the paperwork, the

17   termination papers.

18        Q    It was in the branch that it

19   occurred?

20        A    Yes.

21        Q    Okay.  And were you standing

22   or sitting?

23        A    I sat.  We were sitting at a

FOSHEE & TURNER COURT REPORTERS

Page 192

1    table.

2        Q        Were they all sitting, too?

3        A        Yes.

4        Q        And just the three of you?

5        A        Yes.

6        Q        All right.  And what did they

7    say to you and what did you say to them?

8        A        Not much.  He gave me the

9    paperwork and I read over it and I wrote

10   my comments.

11       Q        Okay.  Did he say anything?

12       A        If he did not very much.

13       Q        Okay.

14       A        Not much at all.

15       Q        And did Ms. Stewart say

16   anything?

17       A        No.

18       Q        Okay.

19       A        Not that I recall.

20       Q        All right.  And then what

21   occurred?

22       A        I pretty much turned in my

23   keys at that time.  He paid me my

FOSHEE & TURNER COURT REPORTERS

Page 193

1    mileage, whatever was outstanding.  I got

2    all my belongings in their presence and I

3    left.

4         Q     Okay.  How long did this whole

5    incident or this whole meeting take

6    place?  How long did it take place?

7         A     At what point?  When he first

8    gave me the paperwork or when he first

9    got there.  It took awhile.  He sat in

10   the parking lot for fifteen minutes.

11        Q     Where were you when he was

12   sitting in the parking lot?

13        A     I was in the branch.

14        Q     Working?

15        A     Yes.  I was on the phone doing

16   collections and it was close to closing

17   time.  It was probably thirty minutes or

18   close to closing time and it was dark

19   outside but I noticed his car pull around

20   and he waited in the parking lot till

21   Brenda Stewart come up and then they both

22   walked in the branch and they sat there

23   and talked about, you know, off the wall

FOSHEE & TURNER COURT REPORTERS

Page 194

1    stuff.  Stuff that is not even pertaining

2    on -- we need to do this.  I need to do

3    that.  You know, nothing pertaining to

4    why they was there.  I sat there in limbo

5    not knowing what's going on.  I knew it

6    was not a pleasant occasion if the DDO

7    and RDO shows up close to quitting time.

8    So I asked him what is this meeting in

9    regards to and they told me just wait and

10   they told me to get my CSR back to the

11   location and that's when I called my CSR

12   on her cell phone and asked her return

13   back to the location.

14       Q    Okay.  And did you have an

15   understanding of who had made the

16   decision to terminate you?

17       A    No.  I mean I don't even

18   recall that I was told.  I read -- I was

19   handed this.  I read everything.  John

20   Knowles signed it and then Brenda Stewart

21   signed off on it.  Then I guess I assume

22   John Knowles made the decision and

23   Brenda Stewart re-enforced that decision.

FOSHEE & TURNER COURT REPORTERS

Page 195

1    Q    Brenda Stewart agreed with it?

2    A    Agreed with it, that's right.

3    Q    During this meeting did

4  Ms. Stewart say anything to you?

5    A    Like I said she -- there was

6  very little said.  I mean not much not to

7  my recollection.  I don't recall her

8  saying anything to me.  She was on the

9  phone a lot prior to us going through the

10  signing of the documentation.  She was on

11  the phone a lot and she and John spoke

12  about something not even pertaining to

13  what was going on at that time and I

14  believe she got on her laptop, I'm not

15  sure, and they talked about the laptop.

16  It was a lot of conversations going on

17  while we were waiting for the CSR to

18  return.

19    Q    After they gave you the

20  report, termination report, you don't

21  recall Ms. Stewart saying anything to you

22  about the termination?

23    A    I don't.  If she did I don't

Page 196

1    remember.

2        Q    Did you say anything to her

3    about the termination report?

4        A    I don't recall saying anything

5    to her.

6        Q    Did you say anything to

7    Knowles about the termination report

8    or the facts?

9        A    No.

10        Q    Did you say anything to

11    Ms. Stewart about the facts of the

12    termination surrounding the termination?

13        A    I don't recall.  I don't

14    recall.  At that point the decision was

15    made without even addressing me or asking

16    me, you know, to tell my side of the

17    story.  When I read the explanation why I

18    was just overwhelmed that a decision was

19    made without even, you know, hearing my

20    side.

21        Q    Later did you, after you got

22    the termination report, how did the

23    meeting end first off?  How did the

1    meeting end?

2         A     I signed it.  And after I

3    signed it, returned it to John Knowles,

4    he signed it and Brenda Stewart signed it

5    and John Knowles got up.  I got up, gave

6    him my keys and I got my things together.

7         Q     And left?

8         A     And left.

9         Q     And after that you applied for

10   unemployment?

11        A     I did.

12        Q     Okay.  And you got it?

13        A     Yes.

14        Q     Did the company contest your

15   unemployment?

16        A     No.

17        Q     Okay.

18        A     To my understanding they did

19   not.

20        Q     So you just got it

21   automatically?  I mean you went in and

22   applied for it and you got it?

23        A     Right.

FOSHEE & TURNER COURT REPORTERS

Page 198

1     Q     After the termination report

2  and after you left what was the next

3  contact you had with Advance America?

4     A     I was called by Heather,

5  which was the CSR at the time, that my

6  last paycheck was there in the branch and

7  that I needed to come and pick it up and

8  we scheduled a time.  She told me when

9  she was going to lunch.  And I came in

10  after her lunch and picked up my last

11  paycheck.

12     Q     Okay.  And then did you have

13  any other contacts after that with

14  Advance America?

15     A     No.

16     Q     Did you go to the EEOC over

17  this?

18     A     That's when I hired legal

19  representation.

20     Q     And you filed a charge?

21  You filed a charge with the EEOC?

22     A     I assume.

23     Q     You don't know?

FOSHEE & TURNER COURT REPORTERS

Page 199

1        A        Yes, we did.  My lawyers

2    representing me and I like I said we did

3    file a charge on the EEOC.

4        Q        Have you ever talked to

5    anybody at the Equal Employment

6    Opportunity Commission?

7        A        No, I haven't.

8        Q        Do you recall ever having

9    signed a sworn charge with the Equal

10   Opportunity Employment Commission?

11       A        No.

12       Q        Did you ever file a grievance

13   with the company under its open door

14   policy?

15       A        With this company?

16       Q        Yes.

17       A        No.

18       Q        Did you ever contact the

19   people at HR and complain about the

20   situation that you were treated unfairly?

21       A        Other than the time that she

22   called me, no.

23       Q        But not about this incident?

FOSHEE & TURNER COURT REPORTERS

Page 200

1      A      No, not about this incident.

2      Q      Could you read what your

3   employee comments were?

4      A      "I do not agree and do not

5   think this decision was made fairly."

6      Q      Is that all you told them at

7   the time of your termination?

8      A      Yes.  That's the only thing I

9   wrote that I recall.  Like I said that

10  was very depressing and distraught to me

11  at that point to be terminated like that.

12     Q      You didn't tell them what you

13  didn't agree to?

14     A      No, not at that point.

15     Q      Let me ask you all of the

16  things that they put up there one, two

17  and three were, in fact, all violations,

18  to your knowledge, of the Fair Debt

19  Collection Practices Act, correct?

20     A      I see number one would be the

21  violation under fair debt.

22     Q      Okay.  Yeah, you're right.

23  Number two would not be.  And number

FOSHEE & TURNER COURT REPORTERS

Page 201

1    three would be noncompliance of the

2    company collection policy and would have

3    been in noncompliance had the facts been

4    as they assumed, correct?

5         A      Right.

6         Q      And, in fact, these are

7    similar violations to what you had

8    received the warning about back in August

9    of 2004, correct?

10        A      Correct.

11        Q      I'm sorry?

12        A      Correct.

13        Q      And you didn't tell

14   Mr. Knowles or Ms. Stewart at the time

15   why you did not think the decision was

16   made fairly, correct?  You just said I

17   don't think the decision is being made

18   fairly?

19        A      That's correct.

20        Q      You didn't tell Ms. Stewart

21   wait just a second this is because of my

22   race this is happening?

23        A      No, because evidently she had

Page 202

1    made up her decision or made up her mind

2    towards whatever decision John Knowles

3    had decided on --

4        Q    And you --

5        A    -- at that point in time.  So

6    I didn't feel like it was -- it would do

7    any good to voice my opinion.

8        Q    You didn't think it would do

9    any good but you also didn't do it,

10   correct?

11       A    Correct.

12       Q    In the past you had raised

13   issues about the way you were treated,

14   correct?

15       A    Correct.

16       Q    You have been vocal about the

17   fact you hadn't gotten promoted, correct?

18       A    I'm sorry

19       Q    You had expressed opinions to

20   people about the reasons of you not being

21   promoted, correct?

22       A    Correct.

23       Q    You never have been afraid to

FOSHEE & TURNER COURT REPORTERS

Page 221

1     Q      Look at the top of the third

2  page of the Complaint.  It's number -- I

3  guess it's a continuation.

4     A      Well, like the toilet incident

5  Edward Finnegan bragged to me, oh yeah,

6  John mentioned that toilet all the time.

7  I never got it fixed.  I had been

8  planning on getting that thing fixed for

9  about a year.

10     Q     I don't think that's what the

11  complaint says though?

12     A      That's what it means.

13     Q      "Plaintiff was made to clean

14  toilets."  And we just discussed that at

15  length, didn't we, and you weren't made

16  to clean toilets were you?

17     A      I knew it was my job -- that

18  was referring to -- I guess that was

19  referring to the toilet incident where I

20  was made to -- I come into the store that

21  was already dirty and I was made to clean

22  up when someone else was there for two

23  years and I was told that the microwave

Page 222

1    had something growing in it and the

2    refrigerator had something in it and I

3    was told it's been there for months.

4        Q    Isn't this the conversation we

5    had earlier where you were told it needed

6    to be cleaned up, and we agreed it was

7    the manager's responsibility and that you

8    and a white female were actually the ones

9    who cleaned the store up?  Isn't that

10   accurate?

11       A    That's what you referred to

12   earlier.

13       Q    What do you mean?  Is there

14   anything different about your statement

15   in here that we need to know that you

16   were made to clean toilets?

17       A    I just explained to you the

18   conditions that I came into.

19   Edward Finnegan was not written up for it

20   because those conditions, which John

21   Knowles witnessed on several occasions in

22   that branch was not written up for, was

23   not made it clean but that the incident

Page 223

1    where I become the branch manager it

2    became an issue where my job was on the

3    line where I had to clean the

4    toilet or fix the toilet from running or

5    clean the microwave or the refrigerator

6    where something was growing in and it's

7    been there for awhile.

8        Q    Now, you weren't told when

9    Mr. Knowles first came in and saw the

10   store in that kind of condition that you

11   were going to be fired if you didn't

12   clean up the toilet and the rest of the

13   facility were you?

14       A    It was written up and you see

15   it, the evaluation, it was one of those

16   mandatory things where I needed to get

17   done.

18       Q    Right.  But you weren't

19   threatened?

20       A    It became an issue.  It

21   was part -- it was part of the

22   termination, wasn't it?

23       Q    I don't think it was but be

FOSHEE & TURNER COURT REPORTERS

Page 224

1    that as it may it was understood by

2    Mr. Knowles you had not created those

3    conditions, correct?

4        A    That's correct.

5        Q    But you were the manager that

6    was taking over the center and you were

7    expected to fix the problem, correct?

8        A    Correct.

9        Q    And that was the same?  Every

10   manager is expected to keep their store

11   clean, correct?

12       A    Evidently.  Not if the store

13   was in that condition when I came into

14   it.

15       Q    What about Ms. French?

16       A    What about it?

17       Q    Wasn't she required to keep

18   the store clean?

19       A    Yeah.  The basic

20   operational -- every branch is

21   responsible for cleaning their own

22   branch.

23       Q    And Ms. French made sure her

Page 225

1    branch remained clean, correct?

2        A    To a certain degree yes.

3        Q    And in this case you could

4    have told Lisa, your subordinate, to

5    clean the toilet, correct?

6        A    Correct.

7        Q    And, in fact, Lisa probably

8    did clean the toilet sometimes, correct?

9        A    Probably.

10       Q    And this business about

11   plaintiff was given less employee support

12   than Caucasian managers.  In that case

13   you're referring to Ed Finnegan, the

14   training manager, correct?

15       A    Correct.

16       Q    Anybody else?

17       A    Well, like I said, if other

18   branches -- during that time we had a

19   higher percentage of bad debt so I was

20   told that there was a person by the name

21   of Todd hired into the company to go

22   around -- he was going to act as a

23   floater.  He would go around to different

Page 226

1    locations and he would stay in that store

2    and he will help out with the collections

3    for a week or month or so and I asked

4    Mr. Knowles on several different

5    occasions that, you know, we have a lot

6    of bad debt here. I really need some

7    help. I really need some help because it

8    was a problem. And I saw the problem

9    areas and I tried to rectify the problem.

10   He told me, okay, I will get you some

11   help. He never did.

12       Q    In the two months you were at

13   that Enterprise store you never got any

14   help?

15       A    Other than my CSR that was

16   there.

17       Q    The floater didn't come around

18   in those two months you were there?

19       A    No.

20       Q    Who was it that made more

21   money than you did, the Caucasian

22   employees who received more money with

23   less experience?

FOSHEE & TURNER COURT REPORTERS

Page 227

1    A    I was told by -- we weren't

2    allowed to talk about salary.  I was told

3    by one branch manager what her salary

4    was.

5    Q    Who was the branch manager

6    and how much was it?

7    A    Her name was Cookie.  I don't

8    know her real name.  She was the branch

9    manager at Andalusia and she stated that

10   she know the salary of other managers and

11   that the salary that I was receiving is

12   nowhere comparable to the other managers.

13   Q    Did she say what the other

14   managers were making?

15   A    I don't recall if she did.

16   Q    Have you seen Cookie since

17   then?

18   A    Since that statement to me?

19   Q    Yes.

20   A    I've never -- we talk on the

21   phone.  She was the branch manager.

22   She's no longer with the company but at

23   that time when we spoke that was when I

Page 228

1    first got transferred or promoted to

2    branch manager in Ozark and that's during

3    the time she was telling me that.

4        Q       And that was, what, about a

5    year or two years before -- was it a year

6    before your termination, two years before

7    your termination?

8        A       A year or so.  A year.

9        Q       And after you heard this did

10   you make any inquiry with anybody like

11   corporate or human relations or anybody

12   of that nature?

13       A       Payroll.

14       Q       Payroll?  What did they?

15       A       She told me she was not

16   allowed to discuss.  I would have to talk

17   to John Knowles.

18       Q       Did you talk to John Knowles

19   about it?

20       A       Yes.

21       Q       What did he tell you?

22       A       He stated that if he give me

23   anymore money I will being making more

Page 229

1    than he's making.  I can't make no more

2    than he make because -- he made light of

3    the situation and laughed it off.

4         Q    So you, sitting here today,

5    you can't really tell me who you're

6    comparing yourself to?

7         A    All the branch managers.

8         Q    All the branch managers?

9         A    At that time.

10        Q    Made more than you did?

11        A    That's what I was told.

12        Q    With less experience?

13        A    As far as with Advance

14   America.  I had been with the company

15   longer.

16        Q    Okay.  As a new branch manager

17   the first day you've got to be the least

18   experienced branch manager, though,

19   correct?

20        A    Right, right.

21        Q    Okay.  Who was paid overtime

22   while you were not?

23        A    I worked many a times off the

FOSHEE & TURNER COURT REPORTERS

Page 235

```
1    stuff like that.

2         Q     That's what his response was?

3         A     Right.

4         Q     You don't remember that

5    customer who told you that?

6         A     I have a name written down at

7    home.

8         Q     Anything else like that you've

9    heard or is that pretty much just the --

10        A     That's pretty much the gist of

11   it but so many customers have come and

12   told me different things like that.

13        Q     Is it true that in

14   November of 2001 you were offered the

15   position at 1655 and turned it down?

16        A     Which location is that?

17        Q     1655, Andalusia.

18        A     That's impossible.  I

19   cannot -- like I explained to John

20   Knowles he stated that there was a

21   location opened up in Andalusia.  My

22   mother is a heart patient.  Her doctor is

23   in Dothan.  And it wouldn't be feasible
```